**La Venda VAN SCHAICK, Plaintiff,**

**v.**

**CHURCH OF SCIENTOLOGY OF CALIFORNIA, INC., et al., Defendants.**

**Civ. A. No. 79-2491-G.**

United States District Court,
D. Massachusetts.

March 26, 1982.

Thomas Greene, Michael J. Flynn, William Sheridan, Thomas Hoffman, Philip Mulvey, Boston, Mass., for plaintiff.

Nancy Gertner, Thomas Shapiro, Silverglate, Gertner & Shapiro, Boston, Mass., for defendants.

## MEMORANDUM OF DECISION AND ORDERS

GARRITY, District Judge.

This case raises a number of questions regarding the jurisdiction of this court, the adequacy of plaintiff's pleadings, and the reach of various federal statutes and constitutional guarantees. The decisions we state below follow a period of procedural maneuvering between the parties. We preface our discussion of the substantive issues presented for decision by reciting relevant portions of that history.

### Procedural History

Seeking relief for herself and on behalf of a class she purports to represent, plaintiff La Venda Van Schaick, a resident of Massachusetts, brought this action originally against the Churches of Scientology of California, Nevada, Florida, Washington, D. C., and New York, and against numerous other corporate and individual defendants, on December 13, 1979. Service was made upon the five above-mentioned defendants by delivery of the summons to the director of legal affairs of the Church of Scientology of Boston. The defendant churches filed a motion to dismiss on January 16, 1980. They argued, either then or later, that the court lacked jurisdiction over the defendants, that service had been insufficient, that venue was improper, that the First Amend-

ment barred inquiry into the subject matter of plaintiff's complaint, that the complaint failed to state a claim upon which relief could be granted, that the plaintiff's pleadings were defective and that various parties were improperly named or joined. Plaintiff filed an amended complaint on May 22, 1980 in which she 1) dropped her claims against all defendants except the five aforementioned churches and two individuals, L. Ron Hubbard, the founder of Scientology, and Mary Sue Hubbard, the second-ranking person in the Scientology hierarchy, 2) sought to add an additional party plaintiff, Sylvana Garritano, and 3) asserted additional claims against the remaining defendants. The complaint, as first amended, asserted that defendants were liable to Van Schaick and Garritano individually for fraud (Counts IV–IX), intentional infliction of emotional distress (Counts X–XII), breach of contract (Count XIII) and violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201, 206 (Count XIV). In addition, the amended complaint sought to state a class action against defendants for treble damages under the civil remedy provision of the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961, 1964 (Counts I–III). Defendants objected to plaintiff's attempt to add a party plaintiff. The court heard oral argument on September 8 and September 10, 1980 and received numerous briefs from the parties regarding plaintiff's motion to amend her complaint and defendants' motion to dismiss.[1]

Plaintiff moved, on September 4, 1981, for a temporary restraining order and for other injunctive relief to prevent the destruction and dissemination of material allegedly stolen by defendants from the office and trash of plaintiff's attorney and in the possession of the Church of Scientology of California and of defendants' lawyers. Plaintiffs also sought the return of those documents. We heard argument on that contested motion on the same day. At the

hearing, we ruled that this court had personal jurisdiction over the Church of Scientology of California and issued a protective order from the bench. That order, the essence of which was subsequently written and entered on September 14, 1981, directed defendants' attorneys to produce for plaintiff's attorney's inspection some 800 allegedly stolen documents and directed the Church of Scientology of California not to destroy or disseminate those documents.

On September 8, 1981, plaintiff moved to amend her complaint again and filed a proposed second amended complaint. Plaintiff stated that her previous motion to amend her complaint was withdrawn. The second amended complaint dropped plaintiff's claims against all defendants except the Churches of Scientology of California and Nevada and the two Hubbards.[2] It also dropped Garritano's claims and changed various assertions presented in the first amended complaint. On September 17, 1981, we directed Garritano to file a pleading seeking either to participate or withdraw from these proceedings. Garritano subsequently advised the court that she had reached a settlement with defendants, which, after review, this court approved. Accordingly, she withdrew from the case, leaving Van Schaick the sole named plaintiff.

The Church of Scientology of California moved on December 24, 1981 that we reconsider our finding of personal jurisdiction over it and that we conduct an evidentiary hearing to resolve that question. We see no point in embellishing upon that ruling at this juncture, but may, in later ruling on the motion to reconsider, discuss further the issues regarding personal jurisdiction.

This case is within the subject matter jurisdiction of this court under 28 U.S.C. § 1332, 29 U.S.C. § 206 and 18 U.S.C. § 1964(c). We decide below some of defendants' motions to dismiss for lack of

1. On August 14, 1981, before disposition of these motions, Garritano moved to substitute counsel. Her affidavit cited "irreconcilable differences" with Van Schaick's attorney, who

had been acting as her counsel as well. We allowed that motion on August 21, 1981.

2. Plaintiff has not served the individual defendants, L. Ron Hubbard and Mary Sue Hubbard.

personal jurisdiction and insufficiency of service, improper venue, failure to state a claim, and on the grounds that the First Amendment bars this action in its entirety.

*Motion to Amend Complaint*

Under Federal Rule of Civil Procedure 15(a) a party may amend its pleadings once as a matter of course at any time before a responsive pleading is served. Since defendants' motion to dismiss is not a "responsive pleading", *McDonald v. Hall*, 1 Cir. 1978, 579 F.2d 120, 121, plaintiff was entitled to amend her complaint without leave of court initially. Defendant objected, however, to plaintiff's attempt to add a party-plaintiff without leave of court, arguing that F.R.C.P. 21, which requires a court order to add a party, not F.R.C.P. 15, governs. And, defendants argued that the addition of Garritano as a plaintiff would fail to satisfy the tests for permissive joinder of F.R.C.P. 20. We need not decide that issue, however. Plaintiff Van Schaick now moves the court for leave to file a second amended complaint. She no longer seeks to add Garritano as a party-plaintiff, and Garritano, having reached a settlement with defendants, no longer seeks to intervene. Of course, a motion to file a second amended complaint requires permission of the court. But that permission is to be "freely given when justice so requires" under Rule 15(a), Fed.R.Civ.P. Accordingly, we grant plaintiff Van Schaick's motion to amend and consider the complaint filed September 8, 1981 as her current pleading.

*Motion to Dismiss*

For the purpose of this motion to dismiss, we assume that the following allegations, contained in Van Schaick's second amended complaint, are true.

Beginning in October, 1971, in Las Vegas, Nevada, Bob Harvey, an agent of the California and Nevada Churches represented to Van Schaick that auditing, the central practice of Scientology,[3] was scientifically guaranteed to have certain beneficial physical, mental, and social consequences for the plaintiff. Similar claims were shown to her in books and documents written by L. Ron Hubbard and disseminated to Nevada by the California Church through the mail. In March of 1972, in Nevada, Harvey also represented that auditing is confidential; that Scientology is a "law-abiding, religious, scientific organization," and that L. Ron Hubbard is a nuclear physicist with degrees from George Washington University and Princeton.

Based upon these representations, plaintiff paid $575 to the Nevada and California Churches for books and auditing courses between October 1971 and March 1972, and continued to purchase auditing services until January 1974. During this period, Van Schaick worked for the Nevada and California Church full time. She left Scientology in 1974.

During the summer of 1975, the plaintiff was contacted in Las Vegas, Nevada, by her auditor, Pam Bevan, who warned her that unless she returned to the Nevada Church, she would be harassed by the Church and its adherents.[4] During the same period, she

**3.** Auditing is a process during which a Scientology employee or agent (Auditor) uses a set of questions and drills, in conjunction with a mechanical device similar to a lie detector (the Hubbard E-meter) to elicit personal information from the subject, for the alleged purpose of psychotherapy. In order to obtain auditing, the subject signs a contract with the Church. The auditor asks questions which locate "Buttons" —a conscious or subconscious indication or response. To help locate "buttons", the auditor uses a Hubbard E-meter, a device which measures skin voltage. During auditing, the auditor pursues lines of questioning on highly personal subjects ("rundowns") to locate the subject's "buttons". The auditor then makes a written record of the disclosures made.

**4.** Plaintiff alleges that it is Church policy to harass ex-members, and that this policy is explicitly authorized in the "Fair Game Doctrine" which states, inter alia:

"Every S. P. (Suppressive Person) Order Fair Game. May be deprived or injured by any means by any Scientologist. May be tricked, sued, or destroyed."

For purposes of the pending motions, we ignore defense counsel's representation at oral argument that the Fair Game Doctrine had been misconstrued and was repealed in 1968.

was locked in a furnitureless room for a period of two weeks against her will at the offices of the Nevada Church in Las Vegas, and was audited for alleged "crimes" committed against the Church. In response she paid approximately $3,000 to the Church and, pursuant to an order to "disconnect" from her husband, obtained a divorce. In April of 1977, the plaintiff went to Clearwater, Florida, for additional auditing, and, in April through May of that year, paid $5,000 to the Florida and California Churches for new courses, books, and auditing. Returning to Nevada in April 1977, Van Schaick remained with the Church until March 1979, when she was declared a "suppressive person" and fled to Boston, in fear of harassment from the Church.

In Boston, Massachusetts, on or about September, 1979, the Nevada, California, and Boston Churches and L. Ron Hubbard, acting in concert, attempted to dissuade plaintiff from pursuing her legal remedies by relaying and eventually disclosing her confidential auditing information to her attorney in Boston, by sending Scientologists from New York and Nevada to threaten her, and by causing the Boston Church to harass her.

*Jurisdiction under the Conspiracy Theory*

■ The plaintiff here claims that this court has personal jurisdiction over the corporate defendants under the conspiracy theory of jurisdiction. The theory, which evolved in a number of cases alleging civil conspiracies, is based upon the notion that the acts of a conspirator in furtherance of a conspiracy may be attributed to the members of the conspiracy for establishing jurisdiction over the person. While the mere presence of a conspirator within the forum state is not sufficient to permit personal jurisdiction over the non-resident co-conspirators, certain additional connections between the conspiracy and the forum state will support the exercise of jurisdiction. These additional connections exist where (1) substantial acts in furtherance of the conspiracy are performed in the forum state and (2) the co-conspirator knew or should

know that the acts would be performed there. *Leasco Data Processing Equipment Corp. v. Maxwell*, S.D.N.Y., 1970, 319 F.Supp. 1256, aff'd in part, rev'd and remanded in part, 468 F.2d 1326 (2 Cir., 1972), on remand, 68 F.R.D. 178 (1974); *Gemini Enterprises, Inc. v. WFMY Television Corp.*, M.D.N.C., 1979, 470 F.Supp. 559, 564, and cases cited therein.

At the outset we note that not all federal courts considering the question have accepted the conspiracy theory as a basis for asserting personal jurisdiction. See *I. S. Joseph Co. v. Mannesmann Pipe and Steel Corp.*, D.Minn., 1976, 408 F.Supp. 1023. Moreover, those federal courts which have exercised jurisdiction under the conspiracy rationale have done so on the basis of the long-arm statutes applicable in the forum states, *Mandelkorn v. Patrick et al.*, D.D.C., 1973, 359 F.Supp. 692; *Ghazoul v. International Management Services, Inc.*, S.D.N.Y., 1975, 398 F.Supp. 307; and no Massachusetts decision has ever adopted the theory. We note, too, that the Court of Appeals for the First Circuit has recently declined to decide whether the Massachusetts long-arm statute contemplates the conspiracy theory. *Glaros v. Perse*, 1 Cir., 1980, 628 F.2d 679, 682 n. 4.

■ As the formulation stated above makes clear, plaintiff's broad, general allegations regarding the conspiratorial nature of the Scientology movement, even if proved, would not warrant the assertion of jurisdiction under the conspiracy theory. The theory gives this court jurisdiction only over any claims which arise from acts *within the commonwealth*. As the Court of Appeals for the First Circuit recently observed in *Glaros v. Perse, supra*, courts which have recognized the conspiracy theory have often required the plaintiff "to pinpoint a connection between the out-of-state defendants and specific acts" in the forum state.

■ Although the plaintiff here does pinpoint some connection between the out-of-state defendants and occurrences in Massachusetts, she fails to submit detailed factual allegations connecting each of the nonresi-

dent defendants with events occurring in this state. Although the courts are divided concerning the necessity of making such a showing, see discussion in *McLaughlin v. Copeland*, D.Md., 1977, 435 F.Supp. 513, 529–33, and the question has not been resolved in this circuit, *Perse, supra* at 682 n.4, we observe that the plaintiff's affidavit differs from the allegations in her complaint with respect to the nature and extent of each church's participation in the alleged conspiracy to harass her in Massachusetts, and conclude that, on the record before us, Van Schaick's reliance on the conspiracy theory is based on nothing but speculation and conjecture on the essential issue of connecting each of the corporate defendants with acts or transactions within the forum state. She simply hopes "somehow and somewhere to find enough facts to create grounds for jurisdiction." Cf. *Socialist Workers Party v. Attorney General of the United States*, S.D.N.Y., 1974, 375 F.Supp. 318, 325. We therefore conclude that there is an insufficient factual foundation for the assertion of personal jurisdiction under the conspiracy theory in this case.

### Venue

■ The defendant churches also argue that venue is improper in this district. The controlling venue statutes are 18 U.S.C. § 1965 for the RICO claims and 28 U.S.C. § 1391(b) and § 1391(c) for the other claims plaintiff asserts.[5]

### Venue under RICO

■ Title 18 U.S.C. § 1965(a) provides that venue is proper for RICO claims where a defendant "resides, is found, has an agent, or transacts his affairs." For a corporate defendant in a private action under this

---

**5.** Since the Fair Labor Standards Act does not contain a special venue provision, the general venue statute controls actions under the Act. *Goldberg v. Wharf Constructers*, N.D.Ala., 1962, 209 F.Supp. 499, 501.

**6.** The special venue provision found in 18 U.S.C. § 1965 is not intended to be exclusive, but is intended to liberalize the existing venue provisions. Therefore, where venue is improper under § 1965(a), it is appropriate to inquire

section to be "found" in the district within the meaning of this section, it must be present in the district by its officers and agents carrying on the business of the corporation. *King v. Vesco*, N.D.Cal., 1972, 342 F.Supp. 120. Since the California Church is carrying on the business of the corporation in this district, both directly, through its own agents, and indirectly, through the Boston Church, venue is proper in this district under 18 U.S.C. § 1965, as to the California Church.

■ It is unclear whether, or in what respects, Van Schaick intends to include the Nevada church as a defendant in her RICO counts, but, in any event, we conclude that venue is improper here with respect to that defendant. Since that defendant does not meet the test for corporate residence enunciated in *King v. Vesco, supra*, venue is improper as to it in this district under 18 U.S.C. § 1965(a). Nor is venue proper here as to this defendant under the general venue provision, 28 U.S.C. § 1391(b).[6] Therefore, the RICO claims, insofar as they pertain to the Nevada Church, must be dismissed.

### Venue for Diversity and Fair Labor Standards Act Claims

Since this is a court action in which the court's subject matter jurisdiction does not rest solely on diversity of citizenship, the applicable venue provision for the remaining counts is 28 U.S.C. § 1391(b). Under these circumstances it provides that venue is proper "only in the judicial district where all defendants reside, or in which the claim arose . . . . Corporate residence, for venue purposes, is defined in 28 U.S.C. § 1391(c) which states:

whether the action can be maintained under the general venue statute, 28 U.S.C. § 1391(b). *Farmers Bank of State of Del. v. Bell Mortg. Corp.*, D.Del., 1978, 452 F.Supp. 1278, 1280–1281. Section 1391(b) provides that venue is proper where the cause of action arose. But since almost all of the acts upon which plaintiff's RICO counts are predicated occurred outside of Massachusetts, none of her RICO claims "arose" in this district.

A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes.

 Since we have held that the California Church conducts business here continuously and systematically, both directly and through the Boston Church, it is "doing business" in this district within the meaning of 28 U.S.C. § 1391(c). Therefore, venue is proper here for the California Church, the only corporate defendant over which we have personal jurisdiction with respect to the diversity and Fair Labor Standards Act claims.[7]

*Motion to Dismiss for Failure to State a Claim*

Having decided that this court has jurisdiction over the Church of California and that venue is proper in this district, we turn now to the merits of defendant's motion to dismiss each count of plaintiff's complaint. The defendant churches argued that plaintiff's first amended complaint must be dismissed because the doctrines and actions alleged as the basis for each cause of action are religious beliefs and practices.[8] The plaintiff, on the other hand, urges that although the Church of California claims to be a religious institution, it is, in fact, part of an organized commercial and criminal undertaking engaged in fraud and that, therefore, none of the First Amendment protections applicable to religions should be accorded defendant.

Quite clearly, the extent to which the religious clauses of the First Amendment protect the Church of Scientology is a ques-

tion relevant to this case. But a review of plaintiff's pleading reveals that the court need not reach the First Amendment issues to rule on defendant's motion to dismiss some of the counts. Some of plaintiff's counts can be, and are, dismissed on grounds other than the First Amendment.

 On the other hand, in some instances even the First Amendment, were it to apply, would not insulate a defendant religious organization or its members from liability. The Supreme Court has recognized that the First Amendment's protection ". . . embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell v. Connecticut,* 1940, 310 U.S. 296, 303–304, 60 S.Ct. 900, 903, 84 L.Ed. 1213. Thus even if we were to find that the California Church is a religious institution, the free exercise clause of the First Amendment would not immunize it from all common law causes of action alleging tortious activity. *Turner v. Unification Church,* D.R.I., 1978, 473 F.Supp. 367, 371, aff'd, 602 F.2d 458 (1979). Nor does the First Amendment exempt religious groups from all regulatory statutes. See, e.g., *United States v. Lee,* —— U.S. ——, 102 S.Ct. 1051, 71 L. Ed.2d 127 (1982); *Heffron v. International Society for Krishna Consciousness,* 1981, 452 U.S. 640, 101 S.Ct. 2559, 69 L. Ed.2d 298; *Prince v. Massachusetts,* 1944, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645; *Reynolds v. United States,* 1878, 98 U.S. 145, 25 L.Ed. 244; *The Founding Church of Scientology of Washington v. United States,* 1969, 133 U.S.App.D.C. 229,

7. The California Church argues that even if its own business activities here are sufficiently extensive to meet the venue requirements of 28 U.S.C. § 1391(c), venue for the entire action is still improper in this district because the venue requirements of 28 U.S.C. § 1391(b) have not been met with respect to the individual defendants. But the defense of improper venue is personal to the party to whom it applies, and a resident defendant may not avail himself of a dismissal or transfer due to improper venue over a nonresident, unless the latter is an indispensable party. *Camp v. Gress,* 1919, 250 U.S.

308, 316, 39 S.Ct. 478, 481, 63 L.Ed. 997; *Vance Trucking Co. v. Canal Insurance Co.,* 4 Cir., 1964, 338 F.2d 943, 944; *Goldberg v. Wharf Constructers,* N.D.Ala., 1962, 209 F.Supp. 499, 503–504.

8. Although defendants have not addressed themselves to plaintiff's second amended complaint, we assume, based on defendants' briefs and oral argument, that they would raise the same objections to plaintiff's most recent pleading.

409 F.2d 1146; *Mitchell v. Pilgrim Holiness Church Corp.,* 7 Cir. 1954, 210 F.2d 879, cert. den. 1954, 347 U.S. 1013, 74 S. Ct. 867, 98 L.Ed. 1136. Whether or not such immunity exists depends, in part, on whether the adjudication of the claim would require a judicial determination of the validity of a religious belief, *United States v. Ballard,* 322 U.S. 78, 64 S. Ct. 882, 88 L.Ed. 1148 and, if not, on whether application of the regulation "is the least restrictive means of achieving some compelling state interest." *Thomas v. Review Board of the Indiana Employment Security Division,* 1981, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624. See also *Sherbert v. Verner,* 1963, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965; *West Virginia State Board of Education v. Barnette,* 1943, 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628; *Cantwell v. Connecticut,* 1940, 310 U.S. 296, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213. Causes of action based upon some proscribed conduct may, thus, withstand a motion to dismiss even if the alleged wrongdoer acts upon a religious belief or is organized for a religious purpose.

We discuss first those counts which we dismiss on grounds independent of the First Amendment. We then turn to those claims against which the First Amendment affords no immunity.

### RICO Claims

The plaintiff brings Counts I–III as class action claims for treble damages under the civil remedy provisions of RICO, 18 U.S.C. § 1964(c),[9] on her own behalf and on behalf of all those who have paid money or property to any Church of Scientology, its employees or agents, "including defendants," as a result of violations of § 1962 of the RICO statute. The subsection of the Act on which plaintiff apparently[10] relies prohibits

any person (including a corporation) employed by or associated with any interstate enterprise, from conducting the enterprise's affairs through a pattern of racketeering activity, 18 U.S.C. § 1962(c). A "pattern of racketeering activity" is defined as the commission of two or more specific criminal acts, including extortion and mail fraud, within a ten-year period, 18 U.S.C. § 1961.

We note, at the outset, the recent opinion of the Supreme Court in *United States v. Turkette,* 1981, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 which accorded RICO a more expansive reading than had some earlier lower courts. Although the Court observed "that the primary purpose of RICO is to cope with the infiltration of legitimate businesses", *Turkette, supra* 101 S.Ct. at 2533, it held that "enterprise" as defined in § 1961(4) and as used in 1962(c) refers to both legitimate and illegitimate enterprises. Thus, after *Turkette,* it is clear that RICO applies to persons who conduct the activities of a wholly illegitimate enterprise (whose activities affect interstate commerce) through a pattern of racketeering activity. Although *Turkette* removes one potential issue from our consideration, it does not establish that RICO covers the facts and allegations of this case. Indeed, we hold that plaintiff has failed to state a claim under RICO.

The theory of plaintiff's complaint ignores the express language of 1962(c) which provides that it shall be unlawful for any person "employed by or associated with any enterprise to conduct or participate . . . in the conduct of such enterprise's affairs . . ." through a practice of racketeering activity. To be sure, a person under RICO includes a "legal entity", 18 U.S.C. 1961(3). And an "enterprise" may be either a legal entity or an informal association, 18 U.S.C. 1961(4), as it was in *Turkette.* But RICO

---

**9.** 18 U.S.C. § 1964(c) states:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

**10.** Plaintiff's complaint itself fails to specify which subsection of § 1962 defendants are alleged to have violated; however, the memoranda of law filed subsequently have made it clear that she predicates her claim on § 1962(c).

quite clearly envisions a relationship between a "person" and an "enterprise" as an element of the offense which 1962(c) proscribes and for which 1964(c) would subject the "person" to treble damages.

Plaintiffs fail to specify this relationship. They several times refer to the Church of Scientology as an enterprise. They seem also to treat the Church of Scientology as the "person" from whom they seek treble damages. The Church of Scientology cannot, at once, be both the associated person and the enterprise. It is only a person, or one associated with an enterprise, not the enterprise itself, who can violate the provisions of the section.

Moreover, we believe that § 1964(c) does not extend to claims like those plaintiff asserts. That provision, which is patterned after § 4 of the Clayton Act, 15 U.S.C. § 15, extends a treble damage remedy to any person injured in "business or property" by a violation of § 1962. Little legislative history exists on the clause. But courts which have recently considered § 1964(c) have interpreted it narrowly. See *Adair v. Hunt International Resources Corp.*, N.D. Ill.1981, 526 F.Supp. 736, 746; *Waterman Steamship Corp. v. Avondale Shipyards, Inc.*, E.D.La., 527 F.Supp. 256, 1981 (available on LEXIS, Genfed library, Dist. file); *Kleiner v. First National Bank of Atlanta*, N.D.Ga., 526 F.Supp. 1019, 1981; *Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co.*, E.D.Mich., 527 F.Supp. 206, 1981, (available on LEXIS, Genfed library, Dist. file). They have consistently concluded that § 1964(c) must be interpreted with careful attention to the provision's purpose and have avoided a slavish literalism that would escort into federal court through RICO what traditionally have been civil actions pursued in state courts. See *Adair v. Hunt International Resources Corp., supra; Waterman Steamship Corp. v. Avondale Shipyards Inc., supra; Kleiner v. First National Bank of Atlanta, supra; Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co., supra; Salisbury v. Chapman*, N.D.Ill., 527 F.Supp. 577, 1981, (available on LEXIS, Genfed library, Dist. file). Just as in the antitrust context the Supreme Court has held that the Clayton Act's treble damage provisions are available to remedy only "injury of the type the antitrust laws were intended to prevent," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 1977, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 so, too, § 1964(c) addresses only a specific sort of injury arising out of racketeering. *Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co., supra; North Barrington Development, Inc. v. Richard Fanslow*, No. 80–C2644, N.D.Ill., October 9, 1980 (available on LEXIS, Genfed library, Dist. file). Indeed, it is telling that whereas RICO's other criminal and civil penalties apply generally to violations of § 1962, the remedy which § 1964(c) prescribes extends only to persons who suffer a specific injury, viz., to their business or property.

Since, as the Court observed in *Turkette*, "the primary purpose of RICO is to cope with the infiltration of legitimate businesses, *supra* 101 S.Ct. at 2533, Congress designed a treble damage provision to protect those whose businesses had been infiltrated and damaged by the offenses § 1962 proscribes. Although § 1962 reaches other types of offenses, see, e.g., *United States v. Turkette, supra*, to which RICO's other remedies were addressed, § 1964(c) confers standing to bring a civil action only on those within a smaller class. *Salisbury v. Chapman, supra* at n. 4. The cases in which courts have held that plaintiffs have, or but for some other defect could have, stated a claim under § 1964(c) have involved business persons engaged in conventional commercial activity who allegedly suffered commercial injury. For instance, in *Hellenic Lines Ltd. v. O'Hearn*, S.D.N.Y. 1981, 523 F.Supp. 244, a shipping firm whose employees had paid and received bribes in connection with a scheme to bill it excessive amounts for the purchase of business related materials and services was held to state a RICO claim. Similarly, a teleprompter company that sued various defendants, including the city council and a business rival, alleging that the rival had received a cable television franchise by exer-

cising corrupt influence on the council clearly suffered the type of business injury RICO addresses. *Teleprompter of Erie, Inc. v. City of Erie*, W.D.Pa., May 11, 1981, Civil Action 81–17 Erie (available on LEXIS, Genfed library, Dist. file) (RICO count dismissed on other grounds). Judge Skinner recently held that a complaint stated a civil RICO cause of action where a company alleged that it suffered business injury through defendants' acquisition of an interest in it through racketeering activity. *Spencer Companies, Inc. v. Agency Rent-A-Car, Inc.*, D.Mass., November 17, 1981, Civil Action 81–2097–S. See also *Parnes v. Heinold Commodities, Inc.*, N.D.Ill., 1980, 487 F.Supp. 645 (RICO civil claim stated where plaintiff alleges defendant's racketeering acts caused him loss through commodities trading). We conclude that these cases reflect proper applications of § 1964(c) to situations in which a defendant's racketeering caused injury to plaintiff in a business activity.[11] The injuries plaintiff alleges here are plainly of a different nature. Count I apparently seeks damages for money the plaintiff class spent in purchasing literature and auditing. Such a claim goes beyond the theory of § 1964(c). Count II alleges no injury to business or property but rather that plaintiff had to flee about the United States and suffered emotional distress. Claims can be brought for such damages, but not under RICO. Finally, the various types of damages Count III alleges do not constitute commercial injury.

To be sure, RICO uses the disjunctive in referring to "business or property." Yet we believe that phrase must be read with the statute's primary purpose—to protect legitimate businesses from infiltration by racketeers—in mind. Thus, in construing "property" courts should be sensitive to the statute's commercial orientation and to Congress' obvious intention to restrict the plaintiff class. We do not believe Congress intended § 1964(c) to afford a remedy to every consumer who could trace purchase of a product to a violation of § 1962. See *Salisbury v. Chapman, supra; North Barrington Development, Inc. v. Fanslow, supra*. Such an interpretation would open the federal courts to frequent RICO treble damage claims by federalizing much consumer protection law and by inviting plaintiffs to append RICO claims for consumer fraud to nonfederal claims thereby achieving treble damage recovery and a federal forum. Yet the legislative history contains no hint that Congress intended RICO as a remedy for private plaintiffs alleging consumer fraud. Cf. *Adair v. Hunt International Resources Corp., supra* at 747 (§ 1964 not intended as remedy for private plaintiffs alleging securities fraud or misrepresentations in real estate transactions). Absent a clear statement that Congress intended such a result, we believe courts should confine § 1964(c) to business loss from racketeering injuries. Under this analysis, the RICO claims before us here clearly cannot survive.[12]

11. Judge Duffy's opinion in *Hellenic Lines, Ltd. v. O'Hearn, supra*, is not to the contrary. He rejected as "specious" the argument that a company that had paid allegedly reasonable prices, though ones inflated by bribes and kickbacks, had not suffered an injury which § 1964(c) addresses since it was "not hurt competitively by the RICO violation." *Ibid.* at 248. We subscribe to Judge Duffy's conclusion that a RICO violation does not depend upon the existence of a competitive injury. Although antitrust law proscribes and remedies certain injuries to competition, RICO does not so directly seek to protect competition. As Judge Churchill observed, "[c]ompetitive injuries and racketeering enterprise injuries would frequently overlap, but they are not necessarily the same." *Landmark Savings v. Loeb Rhoades, Hornblower & Co., supra.* Section

1964(c) does not require a "competitive injury" but rather, in part, a "racketeering enterprise injury" and a plaintiff who has experienced commercial harm resulting from it.

12. We do not reach defendants' contention that civil liability under § 1962(c) and § 1964(c) must be preceded by prior criminal convictions of two criminal acts, except to note that the opposing citations relied on by plaintiff, *United States v. Malatesta*, 5 Cir. 1978, 583 F.2d 748, cert. den., 1979, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777, and *United States v. Frumento*, 3 Cir. 1977, 563 F.2d 1083, cert. den., 1978, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775, are distinguishable in their factual situations and holdings. While it is difficult for us to conclude that Congress, in using the words "indictable" and "punishable" contemplated that civil

Further, two of plaintiff's three RICO counts are deficient in additional respects. Count I, which is based on alleged violations of the mail fraud statute, 18 U.S.C. 1341, apparently intends to claim a violation of all sections of 18 U.S.C. § 1962. Although plaintiff's complaint is not entirely clear on this point, plaintiff predicates her class action solely on Count I, which alleges that defendants violated RICO by failing to conform to the requirements of the decree in *United States v. Article or Device*, D.D.C. 1971, 333 F.Supp. 357, ("Affidavit of Michael J. Flynn in Opposition to Affidavit of Nancy Gertner and in Support of Plaintiff's Motion for Protective Order," filed December 8, 1981, p. 6). Plaintiff relies on defendants' alleged non-compliance with orders entered against the Washington, D.C. Church in the *Articles or Device* case to establish both the fraudulent nature of the materials which were "disseminated" and to show an intent to defraud. Given the factual differences between that case and the instant suit, and considering the different legal standards applicable under the criminal mail fraud statute at issue here and the civil Food, Drug & Cosmetic Act, at issue there, we find Van Schaick's reliance on that litigation misplaced.

Contrary to plaintiff's assertion, the "representations made to plaintiffs in paragraphs 46 and 47"[13] (Plaintiff's Second Amended Complaint, p. 28, ¶ 52) were not adjudged to be fraudulent in *United States v. Article or Device, Etc.*, D.D.C.1971, 333 F.Supp. 357. Judge Gesell did use the word "fraud" in the opinion, but the case held only that the representations about the E-meter there at issue violated the Food, Drug and Cosmetic Act for mislabelling, a holding that did not require a finding of "fraud" but only of "falsity."

It is unclear from the face of plaintiff's complaint what RICO violation Count III intends to allege. Plaintiff alleges that defendants have committed various criminal acts within the purview of 18 U.S.C. § 1961(1), the section that defines racketeering activity. Commission of these criminal acts, the complaint alleges, contradicted representations defendants made, and plaintiff relied upon, concerning the nature of Scientology, viz., that it was "a non-profit, educational, scientific, religious, law-abiding organization." (Plaintiff's Seconded Amended Complaint, p. 34, ¶ 65). Although Count III alleges in conclusory language that various criminal acts were committed against opponents of Scientology, it fails to identify any specific predicate acts or to establish that they were committed within the time period set out in 18 U.S.C. § 1961(5). Even ignoring these deficiencies and assuming for purposes of argument only that Count III does properly allege a pattern of racketeering activity and a violation of § 1962, Count III still fails to suggest any way in which plaintiff was injured in her business or property by these alleged violations of 18 U.S.C. § 1962(c), as 18 U.S.C. § 1964(c) requires. Plaintiff does not claim that the alleged acts—obstruction of justice and criminal investigations, burglary, infiltration of offices, etc. caused her any harm. Rather, she, in effect, attempts to recast her fraud and contract actions, which are discussed below, as a RICO claim and thus gain the benefit of RICO's treble damage provisions. Yet RICO is not broad enough to embrace every fraud action, *Adair v. Hunt International Resources Corp.*, supra at 747; *Waterman Steamship Corp. v. Avondale Shipyards, Inc., et al.*, supra; *Salisbury et al. v. Chapman et al.*, supra; *North Barrington Development, Inc. v. Fanslow*, supra, and surely this is one that is beyond its reach.[14]

Although we dismiss plaintiff's RICO counts on the grounds stated above, we add that these counts would encounter further

---

liability could result without involvement of the criminal process, other courts have done so.

**13.** Plaintiff's complaint does not contain a paragraph 47.

**14.** For the reasons stated above, we dismiss plaintiff's three RICO counts for failure to state a claim upon which relief can be granted. Since plaintiff predicates her class action on one or more of these RICO counts, our ruling eliminates the class claims from this case.

objection if the court should find Scientology entitled to protection as a religion. In order not to risk abridging rights which the First Amendment protects, courts generally interpret regulatory statutes narrowly to prevent their application to religious organizations. At times, they will require "a clear expression of Congress' intent" before subjecting religious organizations to regulatory laws pertaining to other entities, *N.L. R.B. v. Catholic Bishop of Chicago*, 1979, 440 U.S. 490, 507, 99 S.Ct. 1313, 1322, 59 L.Ed.2d 533. Even where clear proof of such intent exists, courts have sometimes construed statutes to exclude religious groups from coverage to avoid "an encroachment by the State into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment." *McClure v. Salvation Army*, 5 Cir. 1972, 460 F.2d 553, 560, cert. den. 1972, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153.

### Intentional Infliction of Emotional Distress
### (Counts X and XII)

Two of plaintiff's counts alleging intentional infliction of emotional distress fail to state a claim. Plaintiff alleges that, contrary to assurances that auditing would remain confidential, the corporate defendants systematically disclosed the auditing information obtained from subjects to control and manipulate them and that the contents of her own auditing file were disclosed (Count X). She alleges further that the defendants intentionally subjected her to emotional distress through the policy of Disconnect (Count XII).

A cause of action for intentional infliction of emotional distress consists of four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct, ... (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly intolerable in a civilized community,' ... (3) that the actions of the defendant were the cause of the

plaintiff's distress, ... and (4) that the emotional distress sustained by the plaintiff was 'severe' and of a nature 'that no reasonable man could be expected to endure it.'" *Agis v. Howard Johnson Co.*, 1976, 371 Mass. 140, 144–145, 355 N.E.2d 315, citing Restatement (Second of Torts) § 46, comments (d), (i), (j).

■ Plaintiff does not state facts sufficient to support her claim with respect to Counts X and XII of her complaint. Count X alleges that defendants have engaged in a "systematic course of conduct" to disclose information received through auditing, and that such a scheme has caused plaintiff severe emotional distress. Yet Count X alleges no specific disclosures, and the only one the complaint specifies is a letter to plaintiff's attorney.

■ With respect to Count XII, plaintiff alleges only that the Church exhorted her to sever family and marital ties and to depend solely on the Church for emotional support. Neither of these alleged courses of conduct constitutes the kind of extreme and outrageous action which will support a claim for intentional infliction of emotional distress. *Cf. Agis, supra* (irrational firing of employee with overt implication of unjustified accusation of theft); *Boyle v. Wenk*, 1979, 378 Mass. 592, 392 N.E.2d 1053 (private investigator's harassing phone calls and visits to woman recently released from hospital); *George v. Jordan Marsh Co.*, 1971, 359 Mass. 244, 268 N.E.2d 915 (harassing debt collection practices). They are similar to the demands for single-minded loyalty and purpose that have characterized numerous religious, political, military and social movements over the ages.

### Contract and Fair Labor Standards Act
### (Counts XIII and XIV)

Plaintiff fails to state a claim for common law breach of contract and for violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201, 206. Her contract claim essentially recasts her fraud allegations, discussed below, in contract terms. The terms of the alleged contract are entirely too

vague to constitute an enforceable agreement. The time of the alleged agreement is not stated, and the parties are unspecified. The only objectively determinable promise alleged is that plaintiff would receive auditing, which she did, in fact, receive. Although we would imply a common law contract if suitable allegations were before us, we will not invent one out of the imprecise and conclusory allegations in this complaint.

 Similarly, the complaint fails to state a claim under the Fair Labor Standards Act (Count XIV). Count XIV is stated in words that defy deciphering. It alleges that defendants "fraudulently induced plaintiff to work for defendants through the fraudulent representations contained in preceding paragraph." Yet "preceding paragraph" contains no representations. Count XIV further rests plaintiff's claim on "said violations set forth in paragraph 121," a paragraph that merely realleges the complaint's preceding paragraphs. We conclude, from plaintiff's unclear statement of her Fair Labor Standards Act claim and from the other allegations in her complaint, that her services were provided primarily in exchange for auditing, rather than monetary compensation. Even considering the allegations, scattered through her pleading, that she was promised some compensation for her services, her complaint, read as a whole, fails to allege facts sufficient to show that she was a "person whose employment contemplated compensation," *Walling v. Portland Terminal Co.*, 1947, 330 U.S. 148, 152, 67 S.Ct. 639, 641, 91 L.Ed. 809, that an employer-employee relationship was ever established between her and the California Church, see *Huntley v. Gunn Furniture Co.*, W.D.Mich., 1948, 79 F.Supp. 110, 111, or that the labor she provided related to commerce or the production of goods for commerce.

 Even if plaintiff properly stated a claim under the Fair Labor Standards Act, the bulk of it would be time-barred. A court may dismiss an action owing to the running of a statute of limitation if the defect appears on the face of the complaint. Title 29, § 255(a) prescribes a three-year limitation for willful violations of FLSA, and a two-year limitation otherwise. Under either limitation, the bulk of plaintiff's claim would be barred. Moreover, although plaintiff provides a summary of dates in paragraph 128, her complaint contains no allegations regarding work performed for defendant other than from March 1972 to January 1974.

Because this count of plaintiff's complaint fails to state a claim upon which relief can be granted, we need not defer decision on it until resolution of whether Scientology is entitled to protection as a religion under the First Amendment.[15]

### Claims Not Barred by First Amendment

Some counts of plaintiff's complaint state proper claims the adjudication of which would not be barred by the First Amendment.

 Count VI sets forth several purely secular representations allegedly made to Van Schaick by defendant's agents. In essence, this count alleges that defendant promised that Van Schaick would receive benefits, including training, room and board, and various work and research opportunities, after undergoing a period of auditing. These representations, the complaint alleges, were fraudulent. Even if Scientology were entitled to protection as a religion, adjudicating the claims this count asserts would not force this court to consider the truth or falsity of religious doctrine, the sort of inquiry *Ballard* forecloses.

 With respect to this claim, however, the complaint presently falls short of

---

**15.** The extent to which the Fair Labor Standards Act applies to religious organizations is unclear. Although the Seventh Circuit did hold that the FLSA covered employees of a church corporation who worked in a church-owned printing establishment, *Mitchell v. Pilgrim Holi-* ness Church Corp., 7 Cir. 1954, 210 F.2d 879, cert. den. 1954, 347 U.S. 1013, 74 S.Ct. 867, 98 L.Ed. 1136, the Supreme Court has not addressed this issue and the legislative history and regulations suggest that religious activities of non-profit organizations were to be exempt.

the specificity F.R.C.P. 9(b) clearly requires of a claim for fraud. The time, place, manner and content of the alleged misrepresentations are not alleged with sufficient particularity to meet the requirements of the rule. Moreover, plaintiff charges a civil conspiracy to defraud, and it is necessary to plead fraudulent conspiracy with enough specificity to inform multiple defendants of facts forming the basis of the conspiracy charge. *National Egg Co. v. Bank Leumi le-Israel B.M.*, N.D. Georgia, 1980, 504 F.Supp. 305, 308. Such allegations must "delineate among the defendants [as to] their participation or responsibilities" in making the statements which are the subject of the suit, *Lerman v. ITB Management Corp.*, D.Mass., 1973, 58 F.R.D. 153, 155 n.2. Conspiracies described in sweeping and general terms cannot serve as the basis for a cause of action, and may be dismissed. *Kadar Corp. v. Milbury*, 1 Cir., 1977, 549 F.2d 230, 233. But because at least some of the misrepresentations alleged in Count VI do appear to be secular on their face, and because plaintiff's pleading burden is extraordinarily heavy due to the First Amendment implications of this litigation, she shall be given an opportunity to amend this count of her complaint, *provided* that any such amendments be filed within 15 days of the date of this Memorandum of Decision and Orders on Various Motions.

It is less clear that Count V of plaintiff's complaint can be decided independently of First Amendment considerations. It alleges that defendants fraudulently represented that auditing was *scientifically guaranteed* to provide an array of benefits, including a higher I.Q. for Van Schaick and her children, immunity from various illnesses, cures for various ailments and better eyesight.

Plaintiff's earlier complaint used the word "would" instead of "scientifically guaranteed." The prior wording would quite clearly have raised First Amendment objections if Scientology was, in fact, entitled to protection as a religion. By replacing "would" with "scientifically guaranteed" plaintiff seeks to avoid that problem. Words are not always adequate, however, to divide precisely that which relates to the sacred and that which is purely secular. As Judge Gesell wrote in *United States v. Article or Device*, D.C.1971, 333 F.Supp. 357, 363:

> What the layman reads as straight science fiction becomes to the believer a bit of early imperfect scripture. The result of all this is that what may appear to the layman as a factual scientific representation (clearly false) is not necessarily this at all when read by one who has embraced the doctrine of the Church.

Although the distinction is not always clear, we believe that even if Scientology is entitled to protection as religion Count V may stand. The First Amendment protects utterances which relate to religion but does not confer the same license for representations based on other sources of belief or verification. Statements citing science as their source may provide the basis for a fraud action even though the same contention would not support such an action if it relied on religious belief for its authority. Although the process of sifting secular from religious claims may not be easy, *Founding Church of Scientology v. United States*, 1967, 133 U.S.App.D.C. 229, 409 F.2d 1146, 1165 n. 3, found that endeavor possible. Should this court find that Scientology is entitled to protection under the religion clauses of the First Amendment, plaintiff would be restricted in proving her claim for relief under Count V, to evidence which did not trench upon constitutionally protected areas.

Like Count VI, Count V presently fails to meet the specificity requirements of F.R. C.P. 9(b); again, the time, place and manner of the alleged misrepresentations are not stated in the precise and particular fashion the rule requires. Moreover, the deficiencies in stating a civil conspiracy to defraud which plague Count VI afflict its predecessor as well. Plaintiff will be given an opportunity to amend this count within the same time limit as set with respect to Count VI.

Finally, taking plaintiff's complaint as a whole, Count XI, which alleges inten-

tional infliction of emotional distress through the Fair Game doctrine, does state a claim upon which relief can be granted. Van Schaick alleges that, pursuant to the Fair Game doctrine, agents of the Church engaged in a course of conduct, including slanderous telephone calls to her neighbors and employer, physical threats, and assault with an automobile, which was designed to dissuade her from pursuing her legal rights. The conduct alleged constitutes "an attempt to intentionally shock and harm a person's 'peace of mind' by invading the person's mental or emotional tranquility," *Wenk, supra* 378 Mass. at 595, 392 N.E.2d 1053, and is therefore actionable. We have noted, however, that the Fair Game doctrine has allegedly been repealed as a matter of Scientology doctrine, and remind plaintiff that it remains her burden to show that the actions taken against her by individual Church members were taken pursuant to some Church policy, practice or directive. With this understanding of plaintiff's allegations, we conclude that Count XI does state a claim upon which relief can be granted.

### Applicability of First Amendment

█ Our decision regarding defendant's motion to dismiss other counts of plaintiff's complaint turns on whether the Church of Scientology is entitled to First Amendment protections. The remaining counts of plaintiff's complaint allege assorted fraudulent conduct by the Church. A claim for relief based upon fraud must include proof that defendant knowingly made a false statement. Proof of those elements—that the statement was false and that defendant knew of its falsity—becomes problematic when the statement relates to religious belief or doctrine. In *United States v. Ballard, supra,* the Supreme Court held that the truth or falsity of religious beliefs were beyond the proper scope of judicial inquiry. Writing for the Court, Justice Douglas explained:

Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others. Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the law. Many take their gospel from the New Testament. But it would hardly be supposed that they could be tried before a jury charged with the duty of determining whether those teachings contained false representations.... (322 U.S. at pp. 86–87, 64 S.Ct. at pp. 886–87).

Plaintiff alleges that she was fraudulently induced to become a scientologist by false representations concerning the nature of the Scientology movement (Count IV) and the content of Scientology doctrine (Counts VII–IX). If the representations involved in plaintiff's fraud counts are entitled to the protection of the First Amendment, *Ballard* would prevent us from examining their veracity. Since an essential element of a cause of action for fraud is the falsity of the representation in question, plaintiff would accordingly fail to state a claim upon which relief could be granted.[16]

Whether the First Amendment immunizes those statements from judicial scrutiny depends, however, on whether the statements relate to religion or religious belief. "Only beliefs rooted in religion are protected by the Free Exercise Clause, which, by its terms, gives special protection to the exercise of religion." *Thomas v. Review Board of the Indiana Employment Security Division, supra* 450 U.S. at 713, 101 S.Ct. at 1430. Before we can determine whether the First Amendment mandates dismissal of any of the fraud counts alleged in this complaint, we must first determine whether defendant is entitled to the constitutional protections reserved for religious institutions and beliefs.

16. We do not construe *Ballard* to hold that, although courts may not examine the truth or falsity of statements of a religious nature, these statements may be the bases of a fraud action if made in bad faith. The Court in *Ballard* never addressed that issue. Rather, it held only that the verity of religious beliefs or doctrines should not be submitted to the jury.

Although courts once interpreted the word "religion" as used in the First Amendment to require belief in a deity, see *Davis v. Beason*, 1890, 133 U.S. 333, 342, 10 S.Ct. 299, 300, 33 L.Ed. 637, they have long since abandoned so restrictive a definition. In *Torcaso v. Watkins*, 1961, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982, the Court held that "religion" as used in the First Amendment applied to nontheistic faiths, too, and explicitly recognized as religions Buddhism, Taoism, Ethical Culture and Secular Humanism, 367 U.S. at 495 n. 11, 81 S.Ct. at 1684 n. 11. More recently, the Second Circuit held that Krishna Consciousness is a religion for free exercise purposes. *International Society for Krishna Consciousness, Inc. v. Barber*, 2 Cir. 1981, 650 F.2d 430, 440.[17] *Torcaso* and *International Society* show that the concept of religion is more capacious than early cases suggested, but they do not, of course, resolve whether the representations at issue here should receive the protection the First Amendment confers.

In evaluating defendant's claim to First Amendment protection, we begin with prior litigation involving the Scientology movement. In *Founding Church of Scientology of Washington, D.C. v. United States*, 1969, 133 U.S.App.D.C. 229, 409 F.2d 1146, Judge Wright found that Scientology had established a prima facie case that it was a religion, 409 F.2d at 1160. This finding was based upon evidence that the church maintained the formal, external appearance of a religion—it was incorporated as a religion; maintained ministers with the authority to marry and bury; and its writings were found to contain a general account of man and his nature.

Significantly, however, in the *Founding Church* litigation, there was no attempt to contest the bona fides of the Church's religious status. Thus, Judge Wright carefully limited his holding, stating:

We do not hold that the Founding Church is for all purposes a religion. Any *prima facie* case made out for religious status is subject to contradiction by a showing that the beliefs asserted to be religious are not held in good faith by those asserting them, and that forms of religious organization were erected for the sole purpose of cloaking a secular enterprise with the legal protections of religion. 409 F.2d at 1162.

The determination in *Founding Church* that Scientology had made a prima facie case for religious status is obviously relevant to, but not conclusive for, our purposes. As Judge Wright pointed out, the government did not contest the issue. Moreover, the determination was made 12 years ago; at the least defendants would have to satisfy this court that the factors Judge Wright found persuasive still exist. Although plaintiff appeared to concede in oral argument that Scientology had made a prima facie case for First Amendment protection, she withdrew that concession in her post-argument brief. Scientology thus might be entitled to protection as a religion, but that entitlement is not clear.

█ If this case involved an established religion, the court could, of course, accord it treatment as such without further inquiry.

17. In *International Society for Krishna Consciousness, Inc. v. Barber*, the Second Circuit held that, absent a showing that no less restrictive alternative existed which would not have interfered with the Krishna ritual of "sankirtan", the practice by which those devoted to Krishna approach non-members, tell them of their religion's tenets and seek contributions, a regulation restricting solicitation at a state fair to a booth unconstitutionally interfered with free exercise rights of members of Krishna Consciousness.

In *Heffron v. International Society for Krishna Consciousness*, *supra*, the Supreme Court upheld a similar regulation restricting solicitation at the Minnesota State Fair as a reasonable time, place and manner restriction on First Amendment rights. The Court reached that decision through a different analysis than that employed by the Second Circuit and one which did not involve an inquiry regarding whether Krishna Consciousness had religious aspects entitling it to the protection of the First Amendment. Judge Kaufman's opinion for the Second Circuit is cited here not for its holding, which the Supreme Court rejected in *Heffron*, but for whatever light it sheds on the separate problem regarding the criteria a court uses to determine when the protection of the Free Exercise clause is properly invoked.

Defendants have contended, in oral argument and brief, that the court "may not favor one religion over another" by taking judicial notice of the fact that an established religion is a *bona fide* religion while refusing to give similar treatment to a less established religion. Although we agree that the Free Exercise Clause protects all religions, old and new, alike once its protection attaches, in determining whether that protection applies courts may require a newer faith to demonstrate that it is, in fact, entitled to protection as a religion. See, e.g., *International Society for Krishna Consciousness, Inc. v. Barber, supra* at 433; *Theriault v. Carlson,* 5 Cir. 1974, 495 F.2d 390, cert. den. 1974, 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279; *United States v. Kuch,* D.D.C.1968, 288 F.Supp. 439. "Not every enterprise cloaking itself in the name of religion can claim the constitutional protection conferred by that status." *Founding Church of Scientology v. United States,* 1969, 133 U.S.App.D.C. 229, 409 F.2d at 1160. In such cases, the bare assertion of a religious nature has not been sufficient to establish First Amendment protection and neither is it here.

■ A motion to dismiss, as a vehicle for determining whether defendant's statements are entitled to the protection of the First Amendment, presents this court with an intractable dilemma. Scientology is not an established religion whose tenets, doctrines, and policies are generally known. The court may not, therefore, by judicial notice identify it as a religion. To take all of plaintiff's allegations as true could strip defendant of all First Amendment protection without any factual showing by plaintiff. To treat Scientology as a religion entitled to the full panoply of First Amendment rights would be to ignore the allegations of the complaint. Ascertaining defendant's status—whether religious or secular—requires reference to extrinsic materials. We therefore conclude that the question whether Counts IV, VII, VIII and IX state a claim upon which relief can be granted cannot be resolved on a motion to dismiss. Therefore, as to those counts we shall treat defendant's motion to dismiss as

a motion for summary judgment and direct the parties to submit materials regarding whether defendant is entitled to protection as a religion under the First Amendment.

■ In making that determination, the *Founding Church* criteria will provide a useful starting point. See 409 F.2d at 1160. We note, too, the similar guidelines Judge Adams enunciated in his concurring opinion in *Malnak v. Yogi,* 3 Cir. 1979, 592 F.2d 197, 208–209; whether the candidate religion addresses matters of ultimate concern, whether its doctrine and practices are comprehensive, and whether it includes certain formal, external characteristics of religious organizations. Most recently, Judge Kaufman, writing for the Second Circuit, has used comparable criteria. *International Society for Krishna Consciousness, Inc. v. Barber, supra* at 440–41. Presentation of proof sufficient to make a prima facie case would entitle defendant to the protections of the First Amendment free exercise clause unless plaintiff effectively rebuts that case. The Supreme Court's recent decision in *Thomas v. Review Board, supra,* makes clear, however, that certain types of inquiry are impermissible in determining whether the First Amendment protects a particular belief as religious. First, courts may not inquire into the truth or falsity of a belief in question. Whether a belief is religious "is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." 450 U.S. at 714, 101 S.Ct. at 1430. Moreover, *Thomas* suggests the difficulty of challenging the good faith of an entire organization and states that courts may not ordinarily consider intrafaith differences among adherents in determining whether a religious belief is sincerely held. Although there may be ways in which a party could rebut a prima facie showing by proving that "forms of religious organizations were created for the sole purpose of cloaking a secular enterprise with the legal protection of a religion," *Founding Church of Scientology of Washington, D. C. v. United States,*

*supra* at 1162, a general inquiry into whether individual members of a religion hold in good faith the belief they assert is not one of them. Rather, testing sincerity of religious belief involves a somewhat truncated inquiry which must focus on extrinsic evidence. See, e.g., *International Society for Krishna Consciousness, Inc. v. Barber, supra* at 441–42.

### ORDERS

In accordance with this Memorandum of Decision the court orders that (1) plaintiff's motion to file a second amended complaint is granted; (2) the Church of Scientology of Nevada's motion to dismiss for lack of personal jurisdiction and venue is granted; (3) defendant's motion to dismiss Counts I, II, III, X, XII, XIII and XIV is granted; (4) defendant's motion to dismiss Count XI is denied, and its motion to dismiss Counts V and VI is denied on the condition that plaintiff file an amended complaint which brings those counts into compliance with Rule 9(b), Fed.R.Civ.P. within 15 days; and (5) defendant's motion to dismiss Counts IV, VII, VIII and IX will be treated pursuant to Rule 12(b), Fed.R.Civ.P., as a motion for summary judgment.

It is further ordered that the parties submit memoranda of law, affidavits and other submissions by May 7, 1982 on said constructive motion for summary judgment; and reply memoranda by May 24, 1982.